# JACK POST *v.* THE STATE.

1. PRACTICE — JURY LAW.— A proffered juror, stating on his *voir dire* that he had formed an opinion, and that evidence would be required to remove it, was further tested by the court, and stated that he had never heard witnesses, nor any one who pretended to know the facts, detail them; that the opinion formed was not definite and fixed; that he had no present conviction, and could render a verdict entirely free from any previous opinion. *Held,* that, the examination of the proposed juror stopping here, the trial court did not err in holding him a competent juror.

2. SAME — EVIDENCE.— As a predicate for the introduction of the written testimony of one A. before an examining court, a witness stated the contents of a letter received from A., showing his permanent removal beyond the jurisdiction of this State. The defendant complains that the letter itself was the proper evidence of its contents, but the judge's explanation to the bill of exceptions shows that the objection to the proof was not made when offered. *Held,* that, to be available, the objection should have been interposed when the proof was first offered.

3. SAME.— The residence beyond the jurisdiction of this State of a witness may be proved as other facts in the case, and no formal, independent oath to that effect is necessary in order to lay a predicate for the introduction of his written testimony.

4. SAME — DEPOSITIONS BEFORE EXAMINING COURTS.— When a deposition is taken before an examining court or a jury of inquest, and is reduced to writing and certified according to law, the defendant being present and the privilege of cross-examination afforded him, and it is shown that since the deposition was taken the witness has died or removed beyond the limits of the State, or has been prevented from attending court by reason of age or bodily infirmity, or through the act or agency of the defendant, or by the act or agency of any person whose purpose it was to deprive the defendant of the benefit of the testimony, the deposition is admissible. See the opinion *in extenso* on the subject.

5. EVIDENCE.— That the defendant told the witness that he got certain property of the deceased was a fact clearly admissible in evidence, it being in proof that prior to the murder the defendant owned no property of the character described, and that immediately after the murder he was found in possession not only of that but of other property of the deceased. It is no objection that this evidence was elicited upon cross-examination of a witness for the defense.

6. SAME.— The erroneous admission of evidence which is neither parti-

nent nor material to an issue in the case, and which could have no tendency whatever to affect or prejudice the rights of the defendant, is not cause for reversal.

7. CIRCUMSTANTIAL EVIDENCE — CHARGE OF THE COURT. — See the opinion *in extenso* for a charge upon circumstantial evidence *held* to be a charge upon the weight of evidence, but which, being neither excepted to by the defendant nor operating to his prejudice, constitutes no cause for reversal.

8. CHARGE OF THE COURT — WEIGHT OF EVIDENCE. — A charge upon the weight of evidence is not necessarily ground for reversal, unless it appears by bill of exceptions that it was objected to at the time, so as to enable the court to correct or withdraw it from the jury. If exception is not taken, such charge may, nevertheless, be made ground in a motion for new trial, refusal of which, if it appears that the charge was flagrant error to the material injury of the defendant, will be cause for reversal.

9. PRACTICE. — No objection having been taken at the time to the action of the court in the appointment of a foreman of the petit jury, and no prejudice appearing to have resulted therefrom, this court will not entertain this objection.

APPEAL from the District Court of Young. Tried below before the Hon. T. L. HUTCHISON.

The indictment, presented on the 21st day of January, 1880, charged the appellant, and his brother Nelson Post, with the murder of G. B. McDermott, in Young county, Texas, on the 15th day of October, 1879. The trial of the appellant, a severance having been granted, resulted in his conviction of murder in the first degree, with the death penalty assessed. The evidence discloses a crime of unusual atrocity, instigated evidently by desire of the perpetrators to possess themselves of a few paltry articles of property belonging to the deceased. The evidence is almost purely circumstantial, but of such strength and character as to convince the jury that the appellant and his brother, and no others, were the guilty agents.

J. W. James testified, for the State, that he was one of a party who searched for the body of G. B. McDermott, supposed to have been murdered in November, 1879. The

skeleton of a man was found by the party, during that month, in a wash-out on the south side of Fish creek, in Young county, Texas, about 300 yards south of McDermott's house, and covered with brush and earth. The skull had been fractured on the temple in front and on the back. It was exhibited on the examination trial. Three tracks were found on the side of the bank of the creek; they were not as fresh as those made by the searching party. The party found gray and black hair where they found the skeleton. The witness did not see the shirt exhibited on this trial, on the body of the skeleton. Blood was found in the southeast corner of the house of deceased. On his cross-examination, the witness stated that the tracks in the bank were below the crossing. He found no blood at the fence, nor in the field between there and the house. The body or skeleton was found 25 feet from the water hole in the creek, the north bank of which was steep and some seven or eight feet high. The witness saw McDermott last on Sunday, October 12, 1879, in company with this appellant, going towards McDermott's house, both riding McDermott's horses, and the latter carrying appellant's gun.

E. P. Thorp, for the State, testified that he had known the appellant one year. The appellant told the witness that he had bought McDermott's wagon and horses for $125. He further told the witness that a man came to McDermott whilst in the field, who McDermott said was his brother, and who stayed an hour and left; and that about an hour by sun two men came to McDermott's, with whom the latter, after winding up his business in an hour, left. The appellant further stated to the witness that he was returning from Graham and met McDermott at Old Brazos about one hour in the night, and that he, McDermott, asked him for the key to get a valuable paper from the house, and that this was the last time he saw McDermott. Appellant had the team and the household and

kitchen furniture of the deceased, and said that he had purchased all from him for $125, borrowing the money from Tom Trout, and that Trout and Nelson Post had witnessed the trade. He did not remember what day appellant said he met McDermott the last time.

The witness was present when the body was found by J. B. James 300 yards south of the house and near the water hole in Fish creek. From the appellant's to McDermott's the distance is about six miles. The witness went to the appellant with Wade Anderson and asked him for Mrs. McDermott's things. He said that he had bought and paid for them, but that if Mrs. McDermott would leave the country, and relinquish to him the rent of the place, he would give them to her. The witness, Anderson, appellant and appellant's wife were present at this interview. The witness went to McDermott's house with Mrs. McDermott, on the third Sunday in November, 1879, and swept out. He searched, and found what he took to be blood. Witness recognized a black and snuff-colored overshirt found on the skeleton as one worn by McDermott for two years, but could not recognize the skeleton itself.

Wade Anderson testified to the facts as stated by the last witness, and, in addition, that the appellant said that McDermott had considerable money in addition to what he had given him. He did not testify to the shirt.

Tom Trout testified, for the State, that he was a nephew of the appellant. He did not witness a trade between the appellant and McDermott nor did he lend the appellant any money. The witness last saw McDermott at Nelson Post's house, on Sunday, October 12, 1879, about 11 o'clock. Appellant and Nelson Post went out to lariat a mule, and were gone about half an hour. After dinner they went out of doors, some 25 steps, and engaged in conversation. At 3 o'clock, appellant and McDermott left, going north, and carrying appellant's gun, a British rifle.

The witness described the gun, and said that it was in good condition on that day, October 12, 1879. About one week later the witness found the gun-stock broken, and was told by the appellant that the wagon had run over it. It bore no marks of a wagon wheel. On the Wednesday following Sunday the 12th of October, 1879, the witness for the first time saw the appellant in the possession of McDermott's things. He said that he had bought them, and offered the witness ten dollars to take the things, wagon and horses off and sell them. The appellant was poor, and had but one mule, and it was held by Slack for the purchase money. A pair of oxen previously purchased by the Posts were taken back by Doc Deaton for non-payment of the purchase money. Appellant raised no corn or cotton in 1879. A short time before his arrest on October 19th, the appellant, in the presence of witness, his (appellant's) wife, mother, and Nelson Post, said that he had to raise $50 for McDermott. The occasion of this remark was the request of Nelson Post to appellant for a dollar which the appellant had. The witness left Nelson Post's house with Doc Deaton at 3 o'clock on October 12, 1879. The witness was at Nelson Post's on the evening that the appellant was arrested. He and Nelson Post went to the appellant's house, and there Nelson Post was arrested. The appellant went into the house to change his clothes, and when witness went in the room where he was, the former put a book in witness' pocket, which the latter found to be a diary and burned it.

James Melton testified, for the State, that on the 4th or 5th of November, 1879, he went with Mr. Brim to the appellant's house to arrest him and Nelson Post, and found the appellant and his wife there. He asked the appellant about McDermott, and he said that all he knew was that he had left the country; that he, the appellant, had bought his horses, wagon and general "plunder," giving McDermott $125 therefor. He further detailed the

statement made by appellant to other witnesses about a man, who McDermott said was his brother, coming to McDermott's field one evening, but to this witness the appellant said that the two men with whom McDermott went off came next day. Appellant told witness that he got Johnson to write a bill of sale, but that neither he nor McDermott could read it, but that he, appellant, had living witnesses to the trade, and asked what offense he committed in going into the house and taking the property. He also told witness that if Mrs. McDermott run at him with law, he would "penitentiary her." He remarked to the witness that McDermott had said he would "like to strike Sam Bass," and he, appellant, asked him, McDermott, if he would rob individuals, and the latter said "no, but railroads and corporations." He, the appellant, said that a search warrant was not necessary, as he would give up the things, and spoke of contract and compromise. The witness found a pistol at the house, which the appellant said he bought from McDermott. He reached the appellant's house in the evening, and had appellant in custody before Nelson Post came up. The conversation between the witness and the appellant occurred before the arrest. While there, the appellant appeared restless.

Dr. J. Q. Dunlap testified, for the State, that the bloody pillow-tick, slip and bed-clothes exhibited are the same he saw in possession of Beard, the constable. Witness was at McDermott's house the day before the body was found, with a search warrant, and there found an old pair of boots which he identified as a pair worn by McDermott the last time the witness saw him. Referring to the skeleton found, he said that the wounds on the head were made with a club or some such instrument. McDermott had a peculiar lock of hair on the left temple, grayer than the rest of his hair, oblong in shape, one and a half inches long and two inches wide. The skeleton had a

similar patch of hair, same in color and on the same temple, but rounder and more irregular and one inch in diameter. The witness could not say that this was McDermott's hair. He has cut McDermott's hair. The lock exhibited on the examining trial was cut from the temple of the skeleton; it was dark and grayish, similar to the peculiar lock worn by McDermott, and is, in the opinion of the witness, the same. The dark, white-spotted shirt found on the skeleton looked very much like a shirt McDermott usually wore.

Mrs. McAbee testified, for the State, that McDermott at the time of his death was her husband. She saw him last in September, 1879, when she went to Parker county. He was to go for her in a week or two. Failing in this appointment, witness became uneasy and returned home by stage. She found notice to rent on her house, and her household and kitchen furniture at appellant's, which he claimed to have bought. The witness saw the shirt found with the body, and recognized it as McDermott's. She had often patched and sewed on it. Recognized the knife exhibited as McDermott's. A bloody mattrass, which the witness has at home, and the bloody pillow and case here exhibited, all of which she obtained from the possession of appellant, she identified as McDermott's.

C. W. Johnson testified that he wrote in blank the bill of sale exhibited for appellant, some time between the September term of the County Court and the time that McDermott was missed. He left blanks for the description of the property.

The bill of sale is set out in the record as follows:

"The State of Texas, County of ——.

"Know all men by these presents that I, Green McDermet, for and in consideration of the sum of $125 dollars to me in hand paid, the receipt whereof is hereby confessed, have bargained, sold and delivered, and by these presents do bargain, sell and deliver to J. J. Post, his heirs or

assigns forever, all the following described personal property, to wit: One bay horse, 15½ hands high, 8 years old, brand J. O. on the rite sholder, one bay horse 14 hands and one inch high, 10 year old, brand M. D., the left shoulder, and a 3 inch steudabaker wagon. To Have and to Hold unto the said . . . . his heirs or assigns, the above described property; and I bind myself and heirs and legal representatives to warrant and forever defend the title to the same against the claim or claims of all persons whomsoever. In testimony whereof I have hereunto signed my name, this —— day of A. D. 187—.''

J. W. Preston, for the State, testified that about the 19th day of September or October, 1879, and about ten days before the arrest of the appellant, on a Sunday afternoon, he saw appellant and Nelson Post in the woods, about 300 yards from Nelson Post's house, writing,— the appellant doing the writing and Nelson Post holding the ink. As the witness approached them they got up and started to leave, but seeing witness they advanced a few steps towards him. Witness remarked, "you are writing a letter?" Appellant said "yes." The paper they were using looked about the size of the paper exhibited (the bill of sale). It had some blank spaces in it, and appeared either to be in two pieces or one piece folded down at the top. They said the children annoyed them so at home they could not write there, and so they came into the woods. They moved off towards the house, but, as the witness started off, they returned, sat down, and went to writing again. The two McDermott horses were near them at the time.

For the State, Wm. Chandler testified that on Sunday evening, about the 10th or 12th of October, 1879, he saw appellant and McDermott together, riding McDermott's horses, and near McDermott's house. McDermott had a gun. He asked witness what he intended doing when water gave out where the witness lived, and asked him

to come and stay at his house while he went to Parker county for his wife. He said he had to pick out a little cotton before he went to Parker county. On the following Sunday the witness went to McDermott's house; he found no one there, and the fence was down and cattle in the field. Evidently they had been in the field three or four days.

John James, Sr., testified that he took dinner with McDermott on the Saturday before he was missed. Appellant was also there. McDermott said that he was going to improve the place. On the next day, Sunday, he saw McDermott and the appellant going towards McDermott's house. One of them had a gun. The witness saw the shirt found with the skeleton on Fish creek, and it looked like the one McDermott wore on the Saturday witness dined with him. The knife shown witness he believed to be McDermott's, as he had seen him whittling with a knife that looked like it. Neither appellant nor Nelson Post had any property, and they raised neither corn nor cotton in 1879.

Hughes testified that the appellant told him on Saturday, October 11th, 1879, that he had sold some cotton and had traded for McDermott's horses, and offered to trade the least of these for one that belonged to the witness. The witness is not positive but thinks this was on the second Saturday in October, 1879; the appellant dined with him that day. It was after McDermott was missed, but before the body was found. Appellant raised no cotton that year.

J. H. Glasgow testified that he found the knife exhibited; it was found about ten or twelve feet below where the skeleton was found, on Fish creek, and in the same ditch.

J. W. Hardy, testifying for the State, said that he saw the appellant and Nelson Post at McDermott's house, loading and moving his property, on the Monday after the third Sunday in October, and after he had heard of the alleged trade.

Doc Deaton testified, for the State, that he was at Nelson Post's on Sunday, October 12, 1879. The Posts, Nelson Post's wife, old lady Post, Tom Trout, and a man they called McDermott or "Mc" were there. When the witness rode up, the appellant and Nelson Post were together, 25 steps east of the house, talking. After dinner appellant gave McDermott "The Life of Sam Bass" to read, and he and Nelson went out, sat down and went to talking; Tom Trout was standing near them. During the day, McDermott had refused to trade horses with Nelson Post, saying that his team suited him, and that he had paid $100 for one of his horses. Appellant said that if he owned the horse he would not take $100 for him. After dinner, appellant and McDermott left together, going north. The witness passed Nelson Post's on the Wednesday following. Appellant and Nelson Post were there, and in possession of McDermott's horses and of a wagon filled with cotton.

O. E. Finlay testified that he was present at the examining trial of this cause, as counsel for the appellant. Dr. Atkinson was examined on that trial. The appellant had opportunity to cross-examine him, and witness did cross-examine Atkinson. The witness could not be certain but was of impression that Dr. Atkinson was sworn. He does not know where Dr. Atkinson now lives. When he left the witness asked him if he expected to return, and he said that he did not know.

Chas. O. Joline testified that he was county clerk and wrote the testimony shown him, and the jurat thereto. The signature is in the handwriting of Dr. J. McC. Atkinson. He left Texas about June 1st, saying that he was going to Arkansas. The witness had received letters from him, written in his handwriting, signed by him, postmarked Pine Pluff, Ark., in which he wrote that he was residing in Pine Bluff, practicing his profession.

The deposition of Dr. Atkinson, taken before the examining court, was read by the State. It showed in sub-

stance that the doctor was called upon by Esquire Jones to make an examination of the carcass found on Fish creek. The bones were those of a human being. No traces of gun-shot wounds could be found, but the head was badly bruised and beaten up. The frontal bone was broken through. The temporal and occipital bones were likewise broken through. The wound in front of the skull seemed to have been inflicted with the pole of an axe. Other bones found were intact, except that the end of one of the fore-arms seemed to have been eaten off by hogs, and a piece was broken off of a thigh bone, which, being soft, could have been broken by hogs. The witness was well acquainted with McDermott, and stated that the hair and whiskers found on the carcass corresponded with those of McDermott. A shirt was on the carcass, and a number of ducking rags were lying around. From appearances the bones were those of a man who had been dead some three or four weeks.

Cross-examined, the witness said that the skeleton may have been of a man dead less than three or four weeks, but he did not think the flesh would have dropped off in less than two weeks. The hole in front of the head was about the length of the pole of an axe, and could not have been cut much smoother with a saw. It appeared to have been made by a heavy blow, an inch and a half above the left eye, breaking the upper edge of the nose and the upper and lower cheek. The lower cheek might have been broken some other way. The other three places were cracks, running in different directions; they did not diverge from the front wound and could not have been made by the same blow.

Tom Trout, recalled by the State, testified that appellant asked him if he would swear that he saw Nelson Post pay McDermott $125. The witness saw no such transaction.

The defense introduced John James, Jr., as first wit-

ness.  He testified that he was at a hole of water with Doc Deaton and old man Deaton, when appellant and McDermott rode by, from a northern direction.  Doc Deaton asked appellant to "come by, and tell us some lies;" to which he responded that he had no time. Deaton told appellant that he would like to exchange horses with him, and appellant, in McDermott's presence and near enough and loud enough to be heard, replied that he would trade either.  McDermott said nothing.

Doc Deaton, for the defense, corroborated this last witness in regard to the proposition to trade horses in the presence of McDermott.  The latter said nothing.

W. H. Slack, for the defense, testified that he let the appellant have a wagon load of corn in 1879, about corn gathering time.  He and Lee Smith assisted appellant to gather the corn.  Witness is appellant's father-in-law.

Lee Smith testified that in 1879 he assisted appellant to gather some corn from the land witness rented from Slack.  Witness owed Slack some corn.  Cross-examined, he said that he rented the McDermott place from appellant, and that appellant told him that he got McDermott's corn and cotton,— about 20 or 25 bushels of corn.

Mrs. Sarah A. Post, mother of appellant, testified that she saw McDermott first at preaching, the next time at appellant's, and the third time at Nelson Post's on October 12th, 1879.  On this last occasion she heard him say to appellant: "Jack, you have got horses and wagon already; you can get the rest of the things whenever you want them, as they are yours."  McDermott on that day wore a black coat, vest, white shirt, good pants and boots.  He and the appellant left in the afternoon, and the latter returned on Tuesday, in the evening.

Cross-examined, the witness stated that McDermott left because of his living in adultery with, and cursing the widow Black.

In rebuttal, Jas. Melton, for the State, testified that

McDermott came in and gave himself up for cursing the widow Black, and gave bond.   The State also introduced the minutes of the court to show that McDermott had pleaded guilty and been fined one dollar, and the testimony of the county attorney to the effect that he had agreed with McDermott to wait on him for his fee.

No brief for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

Hurt, J.   Jack Post and his brother, Nelson Post, were jointly indicted for the murder of G. B. McDermott. After severing, Jack Post was tried and convicted of murder of the first degree; the jury awarding the death penalty.   There are four points raised by bill of exceptions which will first be noticed, and then some observations will be made upon the charge of the court,— that part of the charge which relates to circumstantial evidence.

. The first bill calls in question the action of the court in regard to the competency of two of the jurors.   When tested, these jurors stated that they had formed an opinion and that evidence would be required to remove the same.   Being questioned by the court they stated that they "had never heard witnesses, nor any one who pretended to know the facts, detail them; that the opinion was not definite and fixed; have no present conviction; could render verdict entirely free from any previous opinion."   These jurors were not examined further.   If a juror has formed an opinion, the opinion formed would very likely remain until removed by evidence, though the opinion be ever so slight; hence it becomes very important to inquire into the means or character of information constituting the basis of the opinion.   If the juror has talked with the witnesses, or read what purported to be a correct account of the transaction, the opinion would more likely be definitely settled, and *established*.   If, however, it is formed from reports or rumors, the proba-

bility that it is fixed or established is very much lessened. While it is true that an opinion from rumor may be so well established as to render the jurors incompetent, yet the source of information becomes of vital importance when considering the extent of the convictions of the juror. As before observed, the most feeble opinion requires evidence of some character to be removed. The fact to be ascertained is whether or not the juror has formed such an opinion as will probably influence his verdict. These jurors swore that they had formed no such opinion. Their examination closing just here, we are of the opinion that they were competent, and that there was no error in holding them as such by the court.

It appears by the second bill that one Dr. Atkinson had testified when this case was on trial before the examining court, and that his evidence had been properly reduced to writing by the justice. Afterwards he left Texas, and went to the State of Arkansas. As a predicate for the introduction of his evidence taken before the examining court, the State proved by one Joline that he had received a letter from Dr. Atkinson, postmarked at Pine Bluff, Arkansas, and that in the letter Atkinson stated that he was practicing there; that the letter was written by Dr. Atkinson. The defendant objected upon the ground that the letter should have been produced. So states the bill, but the judge appends the following to the bill: "No objection to the contents of the letter by parol was made at the time. The predicate laid on the testimony of O. E. Finlay and C. O. Johnson in statement of facts." If the defendant had objected to the proof of the contents of this letter at the proper time, the court should and no doubt would have sustained the objection. Not having thus objected, it comes too late after verdict to urge this objection, for a most excellent reason, to wit: if the objection had been taken when the proof was offered, the State would have remedied the defect by producing the letter or accounting for its non-production.

There was no other objection to the predicate laid for the reading to the jury the evidence of Dr. Atkinson, except that there was "no oath made of the fact of said witness living beyond the jurisdiction of this court." It is not necessary *in limine* to make a formal oath to this fact. Proof that the witness lived beyond the process of this court can be made by the same means as any other fact. This, we think, was clearly done by the evidence of the witnesses Finlay and Johnson.

While upon this subject, we desire to state the rule which we think should govern in a case in which the evidence of a witness has been taken before an examining court. If the deposition is taken before an examining court or a jury of inquest, and is reduced to writing and certified according to law, and the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, and since the deposition was taken the witness has died or has moved beyond the limits of this State, or has been prevented from attending the court through the act or agency of the defendant, or by the act or agency of any person whose object it was to deprive the defendant of the benefit of the testimony, or if by reason of age or bodily infirmity such witness cannot attend, the deposition is admissible. This rule has reference to depositions taken before examining courts. We are not treating of this subject generally. Former decisions of this court state the rule applicable to almost every phase of case. Under the above rule, the fact that the witness is dead or beyond the limits of this State, etc., must be proved by the party seeking to use the deposition. Mere temporary absence from the State will not do; the witness must have "*moved* beyond the limits of the State." In regard to this matter, we find no error in the action of the court below.

From the third bill it appears that the State, over the

objection of defendant, proved, on cross-examination of a witness for the defense, "that Post (the defendant) told him he got McDermott's corn and cotton,— about twenty or thirty bushels of corn." This evidence was clearly admissible. It is in evidence that defendant had neither corn nor cotton, and that, just after the murder, he was found in possession not only of corn and cotton, but of the stock, wagon and household goods of deceased. That these facts were elicited from defendant's witness, upon cross-examination, constitutes no error. This matter is entirely within the discretion of the court below; and, if not abused to the injury of the defendant, will not be revised by this court.

It seems from the fourth bill that the State offered to read to the jury certain articles of the Penal Code; to which the defendant objected, and his objection was overruled by the court. By reference to the statement of facts it will be seen that Mrs. Post, mother of the defendant, testified that McDermott left because he was living in adultery with, and for cursing one widow Black. The State introduced the record of the trial of McDermott for the breach of the peace, in which it appears that deceased had been fined one dollar, and proved by the county attorney that deceased had arranged with him for his fee. To meet the charge of adultery, we suppose the articles of the Code were read. To us this last was an anomalous proceeding indeed; and if there was the slightest tendency to injure the rights of the defendant we would be compelled to reverse the judgment. The rule, however, on this subject is this: "If the evidence goes to establish a fact material and pertinent to the issue, if admitted, and is illegal, its admission would be erroneous and must be held so by this court." *Williams* v. *State*, 44 Texas, 116. Nor does the fact that there is other sufficient and competent evidence to support the conviction alter the rule. In this case, however, we fail to see the pertinency or

materiality of the evidence, nor does it appear that the slightest injury was inflicted upon the defendant by its introduction. If it had a tendency to prove a material fact for the prosecution, or if it tended to weaken a material fact proved by defendant, or if it tended to prejudice the defendant in the estimation of the jury, having been objected to by him, we would feel inclined to reverse and remand the case. But, on the other hand, if this court must reverse for every irregularity, though objected to, whether it tended to injure the defendant or not, it would be almost impossible in a great many cases to legally convict. The action of the court in this matter was wrong, but no injury appearing therefrom we cannot make it a ground for reversal. This disposes of all the bills of exception. We are not limited to these, however, for if by bill or otherwise, errors in the record appear calculated to injure the rights of defendant, we will consider them whether pointed out by bill, motion for new trial, or assignment of errors.

In this connection we desire to notice a certain part of the charge of the court which is as follows: "When the State relies upon circumstantial evidence alone in order to warrant a conviction, each fact necessary to the conclusion sought to be established must be proved by competent evidence *beyond* a *reasonable doubt;* all the facts must be consistent with each other, and with the main fact, sought to be proved, and the circumstances taken together must be of a conclusive nature and leading upon the whole to a satisfactory conclusion, and producing in effect a reasonable and a moral certainty that the accused and no other person committed the offense charged. The circumstances should not only be consistent with the defendant's guilt but inconsistent with any other reasonable hypothesis or rational conclusion consistent with the facts of the case. Circumstantial evidence is often as cogent and conclusive upon the

understanding as direct and positive evidence, and all the law exacts from the jury in such a case is that their minds should be satisfied beyond a reasonable doubt of the guilt of the prisoner."

There was no objection taken at the time to that part of the charge which attempted to bolster circumstantial evidence. To us it is passing strange indeed that such a charge should be given in any case, for there is an unbroken line of decision in this State, condemning in the clearest and most unqualified terms, this character of charge. We will cite some of the cases bearing upon the subject: *Walker* v. *State*, 42 Texas, 373; *Stuckey* v. *State*, 7 Texas Ct. App. 174; *Harrison* v. *State*, 8 Texas Ct. App. 183; *Harrison* v. *State*, 9 Texas Ct. App. 407.

If we could presume that this charge was calculated to injure the rights of the defendant, the judgment would be reversed though not excepted to at the time, but as the very able attorney who represented the appellant, and heard the charge read to the jury, did not see any injury at that time, and as we fail to perceive any, though a charge upon the weight of evidence, we cannot hold it such error as will warrant a reversal of the judgment. However, if it had been objected to, we would have been compelled to reverse. The rule upon this state of case is very clearly and concisely stated in the Walker case, cited above: "A charge upon the weight of evidence is not necessarily a ground for reversal, unless it appears by bill of exceptions that it was objected to at the time it was given, so as to enable the district judge to correct it or withdraw it from the jury, if he should think proper to do so." (Arts. 1497 and 1505, Code Crim. Proc.) "If the defendant fails to except at the time, he may still make it a ground for motion for new trial, and then, if it appears so flagrant and as a matter in issue of vital importance, so as to make it error, as it must be — being contrary to law — but also a material error calcu-

lated to injure the rights of the defendant, then it will be good ground for new trial, the refusal of which, if made on such ground, will authorize this court to reverse the judgment of conviction in case of felony."

Applying these rules, and viewing the obnoxious charge in the connection in which it stands, it being in such close juxtaposition with that which is very favorable to defendant and calculated to control and modify its effects, we do not think such injury has been done the defendant as will justify a reversal of the judgment. We cannot leave this subject without expressing the hope that we may never be called upon to pass upon another such charge.

Appellant assigns for error that the judge appointed a foreman of the jury. There was no objection to this at the time; if there had been, we make no doubt the court would have corrected this matter. Being in the habit of appointing foremen led to this error no doubt, and if the attention of the court had been called to the Code at the proper time, the correction would have been made. In this matter no injury appears to have resulted to the defendant. If, however, there had been an objection taken at the time, and the court had persisted, being in direct violation of the Code we would have presumed a wrong motive, and reversed the judgment. This, however, is not the case.

There are a great many points raised by the defendant, but we do not think any are well taken. We have noticed those thought to be the most serious, and have found nothing thus far to authorize us in disturbing the judgment of the court below. The evidence discloses a case of murder of the first degree, committed in the perpetration of robbery. That the defendant is the guilty party, or one of them, there cannot be the slightest doubt. Just after the murder of McDermott, defendant was in the possession not only of his horses, wagon, corn and cotton,

but the bloody fruits of the foul murder. The proof was full and complete, and was made so from a great many different sources. There remains nothing left to us but to approve the judgment. Though the appellant is not represented here by counsel or brief, we have endeavored to give to this record our most serious attention, in order that if there had been such error committed upon the trial as would justify a reversal, we might discover it, and extend relief to the defendant by reversing the judgment and remanding the cause for a new trial. None such has been discovered.

We are therefore compelled to approve the judgment of the court below.

*Affirmed.*